UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

LISA C. CARTER,

          Plaintiff,

                                    Case No. 2:09-cv-968
v.                                      JUDGE SMITH
                                      Magistrate Judge Kemp

ARBORS EAST, INC., *et al.*,

          Defendants.

<u>**OPINION AND ORDER**</u>

      This case arises from Plaintiff Lisa C. Carter's employment termination at Defendant

Arbors East and is before the Court on the Motion for Summary Judgment filed by Defendants

Arbors East and Extendicare Health Services, Inc. (collectively "Defendants") (Doc. 12). The

motion is fully briefed and ripe for disposition. For the reasons that follow, the Motion for

Summary Judgment is **GRANTED**.

## I.  BACKGROUND

      Defendant Arbors East ("Arbors") is a healthcare facility located in Columbus, Ohio.

Arbors provides its residents with long-term care, skilled nursing and rehabilitation, subacute

services and outpatient rehabilitative services. Defendant Extendicare Health Services, Inc.

("Extendicare"), operates Arbors and other healthcare facilities. Plaintiff Lisa C. Carter began to

work at Arbors in April 2006, as a Licensed Practical Nurse ("LPN"). Plaintiff held this position

at Arbors for the entirety of her employment at the facility. In her position, Plaintiff was

responsible for providing care to residents of the facility and supervising other nursing employees.

When Plaintiff was hired, she received a copy of Defendants' Employee Handbook and Code of Conduct, which detailed the rules, policies, and procedures for the healthcare facility. The Employee Handbook contained Defendants' absenteeism policy (the "Absentee Control Policy"), and policies relating to equal employment opportunity, discrimination, and harassment. Minimizing absenteeism is very important in the healthcare field because the patients depend on the care of nurses and other professionals. The presence of nurses is so important that the State of Ohio has nursing personnel requirements for facilities like Arbors. *See* Ohio Admin. Code Chapter 3701-17.

Plaintiff's direct supervisor at Arbors was Unit Manager Fatmata Addison, who is black. Ms. Addison reported to the Director of Nursing ("DON"), Anthony Ooten, who is white. Among other responsibilities, the DON administers discipline for attendance and other issues. As to attendance issues, a scheduler would track each nursing employee's attendance and would notify the DON when a nursing employee's attendance record warranted discipline under the Absentee Control Policy.

The terms of the Absentee Control Policy set forth the discipline to be imposed in relation to employee absences and late arrivals to work. The discipline begins with a First Notice, and progresses with a Second Notice, a Final Notice, a Discharge Warning, and ultimately a Discharge from Employment Notice. The progression through the steps is based on the number of attendance problems during the prior 12 month period. Therefore, after 12 months, absences and late arrivals "drop off" and are not considered.

Plaintiff demonstrated a consistent pattern of attendance-related problems during her employment at the Arbors. Between April 2006, and May 2009, Plaintiff received 21 separate "Absentee Notices," which document the instances of absenteeism or tardiness. Plaintiff does not dispute that she was absent or tardy on the occasions that led to the notices. Plaintiff explains that her absences or late arrivals were due to her obligation to care for her mother.

Despite attendance problems of Plaintiff and other employees at Arbors, she and the other employees were given some latitude as it related to the application of the attendance policy. The latitude was provided because the DON and other management staff were concerned about maintaining a full staff of nursing employees. Because of this latitude, Plaintiff and other employees were not terminated even though they could have been on several occasions under the attendance policy. In addition to the attendance problems, Plaintiff was disciplined for other issues relating to her failure to clock in and out as required, failing to follow proper call-in procedure, and verbally abusing others.

According to Mr. Ooten, in early 2009, because of the attendance problems demonstrated by Plaintiff and other employees, Mr. Ooten held a meeting with all nursing-related employees, including Plaintiff. At the meeting, Mr. Ooten informed them that, even though the employees had been given latitude as to their attendance problems, the attendance policy would be strictly enforced from that point onward. (Ooten Aff. ¶ 16). Plaintiff denies that Mr. Ooten held a meeting to inform the nursing staff that he was going to start strictly enforcing the attendance policy. (Pl. Aff. ¶ 19). In February, April, and May 2009, Plaintiff continued to have attendance problems, and she received notices and a discharge warning as a result of these absences or late arrivals.

During the evening of May 28, 2009, there was an incident at the Arbors involving smoke emanating from an air conditioning unit.  Plaintiff was on duty at the time and was the first to respond to the situation.  Plaintiff called the fire department and helped move residents from their rooms.  Plaintiff later called Mr. Ooten to update him on the situation.  Also, according to Plaintiff, she told Mr. Ooten that she might be late the next day for work because she did not feel good, and that he told her "that's not a problem," and "don't worry about it." (Pl. Aff. ¶ 6; Pl. Dep., p. 109).  Mr. Ooten denies that Plaintiff told him that she might be late for work on May 29, 2009, but he also indicated that he does not recall any conversation he may have had with Plaintiff during the evening of May 28, 2009.  (Ooten Dep. 40-41).

Before her shift began on the morning of May 29, 2009, Plaintiff called the night shift nurse supervisor and asked whether she could take the day off.  The supervisor told Plaintiff that she should report to work because the supervisor did not know how many nurses were scheduled for the day shift.  Plaintiff believed that the smoke she inhaled the night before was aggravating her throat.  Plaintiff asserts that she was concerned by this aggravation because she had food lodged in her throat a few months earlier, which had caused a fellow nurse to perform the Heimlich maneuver on her.  Additionally, Plaintiff had suffered ongoing acid reflux problems. Plaintiff arrived late to work, and then asked her supervisor and the scheduler if she could leave because she did not feel good.  They did not let her leave for the day because of nursing coverage requirements, but they did allow her to leave for a short period of time to obtain acid reflux medicine.

On June 1, 2009, the "Scheduler," Natasha McIntyre, informed Mr. Ooten that Plaintiff had reported late for work on May 29, 2009.  Mr. Ooten then reviewed Plaintiff's attendance records and determined that the latest occurrence required a Discharge Warning under the

Absentee Control Policy.  Because this was her third Discharge Warning, Mr. Ooten determined that termination of Plaintiff's employment was the proper action under the absenteeism policy. The absenteeism policy provides for termination upon an employee's receipt of three Discharge Warnings during his or her employment with Extendicare.  Consequently, Mr. Ooten consulted with the Administrator at Arbors and the Area Director of Human Resources, who concurred with Mr. Ooten's conclusion.  The decision to terminate Plaintiff's employment was finalized on June 1, 2009.  To document the termination, an Absenteeism Notice was prepared.

Mr. Ooten expected Plaintiff to report to work on June 2, 2009, as scheduled.  Mr. Ooten planned to provide the Absenteeism Notice to Plaintiff when she reported to work.  However, on June 1, 2009, Plaintiff was having difficulty swallowing and went to an urgent care facility.  The doctor at the urgent care facility directed her to go to the emergency room at Grant Medical Center ("Grant").  The examining doctor at Grant determined that Plaintiff needed to see a specialist who could perform an endoscopy procedure.  The procedure was scheduled for the next day.  During the morning of June 2, 2009, Plaintiff arrived at the Arbors with paperwork pertaining to her procedure.  No one indicated to her that there was an issue with her employment.  Plaintiff subsequently reported for her surgical procedure at noon that day.  The procedure involved general anesthesia, the endoscopy, the physical stretching of her esophagus, and the removal of food from the esophagus.

Because Mr. Ooten did not see Plaintiff during the morning of June 2, 2009, he decided to contact her by telephone.  According to Mr. Ooten, he contacted Plaintiff by telephone and asked her to come in to the facility, and when she refused, he told her she was terminated. (Ooten Aff. ¶ 27).  According to Plaintiff, Mr. Ooten called her when she was in the recovery

area after her surgical procedure, he asked how the procedure went, and then he told her she was fired for excessive tardiness. (Pl. Aff. ¶ 12).

At the time the decision to terminate Plaintiff's employment was finalized on June 1, 2009, Mr. Ooten was unaware of any medical issue that impacted Plaintiff's ability to work, and Plaintiff had not asked for time off under the FMLA. (Ooten Aff. ¶ 25). Although Plaintiff had been diagnosed with acid reflux prior to her termination, she was diagnosed with the esophagus constriction problem after her termination. (Pl. Dep., p. 105).

On June 4, 2009, Plaintiff's physician submitted a medical statement to the staff at the Arbors indicating her inability to return to work until June 9, 2009, due to a "foreign body in esophagus." (Pl. Dep. Ex. 17). On June 8, 2009, the same physician submitted a noted indicating Plaintiff's inability to return to work until June 15, 2009, due to the "FMLA." *Id.* This was the first time that Plaintiff had asked for FMLA leave. Mr. Ooten viewed this request as inconsequential as Plaintiff had already been terminated and was therefore not scheduled to work on the dates listed by the physician.

In October 2009, Plaintiff initiated her action against Defendants in the Court of Common Pleas for Franklin County, Ohio. Defendants removed the action to this Court on the basis of federal question jurisdiction, 28 U.S.C. § 1331. In August 2010, Defendants filed their Motion for Summary Judgment. This motion is ripe for disposition.

## II. SUMMARY JUDGMENT STANDARD

The standard governing summary judgment is set forth in Rule 56 of the Federal Rules of Civil Procedure, which provides:

> The judgment sought shall be rendered if the pleadings, the discovery and
> disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the movant is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.,* 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must view all the facts, evidence and any inferences that may permissibly be drawn from the facts, in favor of the nonmoving party. *Matsushita*, 475 U.S. at 587. The Court will ultimately determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-53. Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner*,  570 F.2d 107, 111 (6th Cir. 1978). The Court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Liberty Lobby*, 477 U.S. at 249; *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003).

In responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present

affirmative evidence in order to defeat a properly supported motion for summary judgment.'"
*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (*quoting Liberty Lobby*, 477
U.S. at 257).  The existence of a mere scintilla of evidence in support of the opposing party's
position is insufficient; there must be evidence on which the jury could reasonably find for the
opposing party.  *Liberty Lobby*, 477 U.S. at 252.  The nonmoving party must present "significant
probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the
material facts."  *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).  The
Court may, however, enter summary judgment if it concludes that a fair-minded jury could not
return a verdict in favor of the nonmoving party based on the presented evidence.  *Liberty Lobby*,
477 U.S. at 251-52; *see also Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish
that it is bereft of a genuine issue of material fact."  *Street*, 886 F.2d at 1479-80.  That is, the
nonmoving party has an affirmative duty to direct the court's attention to those specific portions
of the record upon which it seeks to rely to create a genuine issue of material fact.  *In re Morris*,
260 F.3d 654, 665 (6th Cir. 2001).

## III.  DISCUSSION

Plaintiff's Complaint sets forth four claims against Defendants.  Plaintiff asserts claims
for race discrimination under 42 U.S.C. § 1981 and Ohio Revised Code § 4112.99 (Counts I-II),
a claim for wrongful termination under the Family and Medical Leave Act ("FMLA") (Count
III), and a claim for disability discrimination under Ohio Revised Code § 4112.99 (Count IV).
The Court will address these claims in turn.

A.     Race Discrimination Claims

Plaintiff, an African-American, asserts that her employment at Arbors was terminated because of her race, in violation of federal and state law.  Ohio Revised Code § 4112.99 provides that "[w]hoever violates this chapter is subject to a civil action for damages, injunctive relief, or any other appropriate relief."  Plaintiff's state law race discrimination claim derives from Ohio Revised Code § 4112.02, which in pertinent part prohibits an employer from discharging an employee without good cause because of the employee's race, or otherwise from discriminating against that employee on the basis of race with respect to the conditions or privileges of employment.  The statutory basis of Plaintiff's federal race discrimination claim, 42 U.S.C. § 1981, similarly prohibits racial discrimination in the "making, performance, modification, and termination of contracts."  These claims are properly analyzed under the same standards applicable to Title VII claims.  *Thompson v. UHHS Richmond Heights Hosp., Inc.*, 372 F. App'x 620, 623 (6th Cir. 2010).  When there is no direct evidence of discrimination, as in this case, courts operate under the "the well-established *McDonnell Douglas/Burdine* burden-shifting framework."  *McClain v. Northwest Community Corrections Ctr. Judicial Corrections Bd.*, 440 F.3d 320, 332 (6th Cir. 2006).

To establish a *prima facie* case of racial discrimination, Plaintiff must establish, or at least present facts from which a trier of fact could reasonably infer, that (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment decision; and (4) she was replaced by a person outside the protected class or treated differently than similarly situated white employees who engaged in the same or similar conduct.  *Id.*  If Plaintiff succeeds in establishing a *prima facie* case of racial discrimination, the burden shifts to Defendants to articulate a legitimate, nondiscriminatory reason for her discharge.  Should

-9-

Defendants meet their burden of production, Plaintiff must then produce evidence that the defendant's proffered reason was not the true reason, but was merely a pretext for its unlawful racial discrimination. *Id.* (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Plaintiff may demonstrate pretext by showing that Defendants' articulated reason (1) had no basis in fact, (2) did not actually motivate the adverse action taken against her, or (3) was insufficient to motivate the adverse action taken against her. *Id.* (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

Defendants argue that Plaintiff cannot demonstrate a *prima facie* case of race discrimination because she cannot show that Arbors replaced her with an employee of a different race or that Arbors treated her less favorably than any similarly-situated employee of a different race. It is undisputed that Plaintiff, an African-American, was qualified for her position (she had been an LPN for many years), and that she suffered an adverse employment decision (she was fired). And Plaintiff does not allege that she was replaced by a person of a different race. The parties dispute whether Plaintiff has demonstrated that she was treated less favorably than a similarly situated Caucasian.

To be deemed "similarly situated," the comparable employee "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." (Emphasis added) *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). In determining whether an allegedly comparable employee is similarly situated, the ultimate question is whether "all of the relevant aspects of [his] employment situation were 'nearly identical' to those of the [comparator's] employment situation."

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998); *Clayton v. Meijer*, 281 F.3d 605, 611 (6th Cir. 2002).

Plaintiff identifies two individuals who, according to her, are similarly situated persons who received more favorable treatment than her for the same or similar conduct. First, Plaintiff compares herself to Christina Bulmer. Ms. Bulmer, a Caucasian State Tested Nursing Assistant ("STNA"), worked at Arbors until her employment was terminated in January 2008 for attendance problems. Plaintiff alleges that Ms. Bulmer had attendance problems in 2006 and 2007, but was not terminated for these problems, even though the attendance policy called for her termination. Plaintiff's argument that Ms. Bulmer is a proper comparator is unpersuasive. Evidence in the record indicates that the STNA position is "very different" from the LPN position held by Plaintiff. (Ooten, Aff. ¶ 30). Furthermore, insofar as Plaintiff argues that Ms. Bulmer was treated more favorably than Plaintiff in 2007, this argument is without merit because Plaintiff, like Ms. Bulmer, could have been terminated under the attendance policy if the policy had been strictly applied at that time. That is, both Plaintiff and Ms. Bulmer benefitted from management's decision not to strictly apply the attendance policy in 2007. Ms. Bulmer's employment was terminated in January 2008 because of attendance problems, and Plaintiff's employment was terminated after management decided to begin strictly applying the attendance policy in early 2009. Thus, when the application of the attendance policy changed, Ms. Bulmer had already been terminated. Plaintiff cannot show that Ms. Bulmer was similarly situated and that she was treated more favorably than Plaintiff.

Second, Plaintiff compares herself to Lori Berry. Like Ms. Bulmer, however, Ms. Berry is not a proper comparator. Ms. Berry, a Caucasian LPN, worked at Arbors until her employment was terminated in June 2007, which was nearly two years prior to Plaintiff's

-11-

termination.  Ms. Berry had significant attendance problems prior to her termination in 2007. But management did not strictly apply the attendance policy to her, just like it did not strictly apply the attendance policy to Plaintiff.  Ms. Berry was terminated prior to management's decision to begin strictly applying the attendance policy, and therefore is not a proper comparator.  The evidence undeniably shows that Ms. Berry, Ms. Bulmer, *and* Plaintiff, all benefitted from management's decision not to strictly apply the attendance policy prior to 2009. That Plaintiff was terminated after the policy changed (and after Ms. Berry and Ms. Bulmer had already been terminated) does not show unfair treatment.

Therefore, the Court finds that Plaintiff fails to identify any similarly situated employee who was treated differently for attendance problems during 2009, the year of Plaintiff's termination.  Consequently, Plaintiff cannot show a *prima facie* case of race discrimination.

Even assuming *arguendo* Plaintiff has presented a *prima facie* case of race discrimination, Defendants provide a legitimate, non-discriminatory justification for Plaintiff's employment termination.  Defendants have produced evidence demonstrating that Plaintiff was terminated due to her attendance problems.  Evidence in the record shows that Plaintiff's attendance issues resulted in her receiving three discharge warnings, which, under the company's attendance policy, warranted her termination.  Extendicare's attendance policy provides that, if an employee receives a third discharge warning due to attendance issues, then the employee's discharge is warranted.  It is undisputed that Plaintiff received three discharge warnings.  And because it reasonably cannot be disputed that poor attendance records provide a legitimate basis for adverse employment actions, *see, e.g.*, *Bacon v. Honda of America Mfg., Inc.*, 370 F.3d 565, 576 (6th Cir. 2004), Defendants have produced evidence of a legitimate, non-discriminatory reason for Plaintiff's termination.

-12-

Plaintiff argues that the reason provided for her termination was pretextual.  Plaintiff argues that her attendance problems is a pretextual reason for her termination because (1) Ms. Berry and Ms. Bulmer were not terminated despite having attendance records much worse than that of Plaintiff, (2) Mr. Ooten told Plaintiff she could be late on May 29, 2009, (3) management knew Plaintiff was sick on May 29, 2009, and that she had asked for the day off, and (4) Plaintiff should have been told to use FMLA time because she was caring for her mother.  The Court finds Plaintiff's pretextual arguments to be unpersuasive for the following reasons.

First, the fact that neither Ms. Bulmer or Ms. Berry was terminated for attendance problems prior to 2008 (just like Plaintiff), does not reasonably demonstrate that Defendants' reason for terminating Plaintiff in 2009 is without credence.  Second, Plaintiff does not deny that she arrived late for work on May 29, 2009, or that, under the attendance policy, the late arrival warranted a third discharge warning.  Plaintiff essentially argues that she should not have received any discipline for her late arrival because it was, or should have been, excused. Although Plaintiff has testified that Mr. Ooten said it would be "okay" if Plaintiff arrived late at work on May 29, 2009, which Mr. Ooten disputes, she also testified that when she called in prior to her shift that day, she was instructed to report to work because the nursing coverage was uncertain.  There is no evidence that Plaintiff indicated to the scheduler that she would be late on the morning of May 29, 2009.  Even though there may be some dispute over the facts upon which her discharge was based, Plaintiff must still put forth evidence demonstrating that her employer did not "honestly believe" in the proffered non-discriminatory reason for her termination. *See Smith v. Chrysler*, 155 F.3d 799, 806-807 (6th Cir. 1998).  Lastly, Plaintiff did not request any FMLA leave prior to her late arrival on May 29, 2009, and Plaintiff cites no law providing that an employer's failure to advise an employee of the possible availability of FMLA

-13-

leave demonstrate's pretext.  In sum, Plaintiff fails to present evidence reasonably demonstrating that the employer's reason for her termination was a pretext for unlawful discrimination.

For these reasons, Defendants are entitled to summary judgment in their favor as to Plaintiff's race discrimination claims.

B.     Disability Discrimination Claim under Ohio Law

Plaintiff asserts that management at Arbors terminated her employment because of her disability, in violation of Ohio law.  Ohio law provides that "[i]t shall be an unlawful discriminatory practice . . . [f]or any employer, because of the . . . disability . . . of any person . . . . to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."  Ohio Rev. Code § 4112.02.  Absent direct evidence, which Plaintiff does not allege, Plaintiff can prevail on this claim through the burden-shifting framework outlined above in reference to her race discrimination claims. *See Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696 (6th Cir. 2008) (applying *McDonnell Douglas* burden-shifting to ADA claim); *Columbus Civil Serv. Comm. v. McGlone*, 697 N.E.2d 204 (Ohio 1998) (Ohio courts look to cases and regulations interpreting the ADA when interpreting Ohio anti-discrimination statutes).

To establish a *prima facie* case of disability discrimination under Ohio law, a plaintiff must demonstrate that (1) the plaintiff had a disability, (2) the defendant took an adverse employment action, at least in part, because the plaintiff had the disability, and (3) the plaintiff, while having a disability, could safely and substantially perform the essential functions of the job in question. *Wallace v. Mantych Metalworking*, 937 N.E.2d 177, 183 (Ohio Ct. App. 2010).  For the purpose of Section 4112.02, "[d]isability" is defined as "a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's

-14-

self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment."  Ohio Rev. Code § 4112.01(A)(13).

Defendants argue that Plaintiff cannot demonstrate that she was disabled or that she was terminated because she was disabled, and that even if Plaintiff could demonstrate a *prima facie* case of disability discrimination, she cannot demonstrate that Arbors' non-discriminatory reason for the discharge was a pretext for discrimination.  Plaintiff argues that she has a disability, that Arbors knew of her disability when management decided to terminate her employment, and that the reason for her termination is pretextual.

The undisputed evidence in the record demonstrates that Plaintiff had not been diagnosed as to the nature of her esophageal problem before her employment was terminated.  While she had been diagnosed with acid reflux, she was unaware that her esophagus was eroding and narrowing until she was examined by physicians on June 1, 2009.  Plaintiff has demonstrated that, at times, she had difficulty swallowing or breathing because of her esophageal problem. For example, evidence shows that one of Plaintiff's co-workers at Arbors performed the Heimlich maneuver on Plaintiff to extract food that was lodged in her throat.  Plaintiff apparently takes medication for her condition, and she will need biennial corrective surgeries to treat the condition and expand her esophagus.  However, because Plaintiff only presents evidence of intermittent difficulty in swallowing or breathing, she has not presented evidence that her condition causes a significant restriction on her ability to eat, breath, or perform any other major life activity.  As noted by the Sixth Circuit Court of Appeals, an "impairment that only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation under the Act."  *Mahon v. Crowell*, 295 F.3d 585, 590-91 (6th Cir.

-15-

2002).  Therefore, Plaintiff has not presented evidence that she was "disabled" as that term is used in Section 4112.02.

Furthermore, Plaintiff has not presented evidence reasonably demonstrating that Arbors terminated Plaintiff's employment because of a disability.  In order to demonstrate that an employer discharged an employee because of a disability, it must be shown that the employer had either actual or constructive notice of the disability before the discharge.  *See Brown v. BKW Drywall Supply, Inc.*, 305 F. Supp.2d 814, 828 (S.D. Ohio 2004) (Marbley, J.) (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1185 (6th Cir. 1996)).  Although Plaintiff alleges that her esophageal constriction problem constitutes a disability, she did not know the nature or extent of the problem until she was examined on June 1, 2009, and she did not notify Arbors that she was having surgery to treat this problem until, at the earliest, June 2, 2009.  As discussed above, the evidence shows that Arbors management finalized the decision to terminate Plaintiff's employment on June 1, 2009, when Mr. Ooten consulted with other management personnel.  Plaintiff attempts to dispute this fact by citing the letter, dated June 11, 2009, sent to her from the Arbors' Administrator, which states that she was terminated on June 5, 2009.  Although June 5, 2009, may have been the date that Plaintiff was administratively terminated from employment, this evidence does not discredit Mr. Ooten's testimony that the actual decision to terminate Plaintiff from employment was finalized on June 1, 2009.  Therefore, Arbors management did not have notice of Plaintiff's esophageal constriction condition until after management decided to discharge her for attendance problems.

Additionally, even assuming *arguendo* that Plaintiff has presented a *prima facie* case of disability discrimination, Defendants present evidence of a legitimate, non-discriminatory reason for her discharge – Plaintiff's attendance problems.  And, for the reasons discussed above in

reference to Plaintiff's race discrimination claim, Plaintiff fails to present evidence reasonably demonstrating that this reason was pretextual.

Accordingly, Defendants are entitled to summary judgment in their favor on Plaintiff's disability discrimination claim under Ohio law.

C.     FMLA Wrongful Termination Claim

Lastly, Plaintiff alleges that Arbors management unlawfully terminated her employment because she sought medical leave under the FMLA.  The FMLA provides that it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter," 29 U.S.C. § 2615(a)(1), and that it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2).  Thus, an employer may not retaliate or discriminate against an employee for taking FMLA leave.  *Hunter v. Valley View Local Schools*, 579 F.3d 688, 690 (6th Cir. 2009).

Like Plaintiff's other claims, the *McDonnell Douglas* burden-shifting analysis applies to her FMLA retaliation claim.  *See Skrjanc v. Great Lakes Power Service Co.*, 272 F.3d 309, 314-15 (6th Cir. 2001).  To make a *prima facie* case of FMLA retaliation, Plaintiff must show that: (1) she exercised protected rights under the FMLA; (2) the employer took an adverse employment action against her, and (3) there was a causal connection between the plaintiff's exercise of her FMLA rights and the adverse employment decision.  *Id.*

Defendants argue that Plaintiff cannot satisfy the elements of her FMLA claim.  Because Plaintiff was terminated, Defendants do not argue that she cannot meet the second element of her FMLA claim.  Defendants argue, however, that Plaintiff cannot prove she exercised a protected right under the FMLA, or that there was a causal connection between the exercise of such rights

-17-

and her termination.  Plaintiff argues that Defendants interfered with her right to take appropriate leave under the FMLA.

The Court agrees with Defendants argument that Plaintiff cannot demonstrate the first and third elements of a *prima facie* case of FMLA retaliation.  The decision to terminate Plaintiff was made on June 1, 2009, and Plaintiff was informed of this decision on June 2, 2009.  The undisputed evidence further demonstrates that Plaintiff did not submit her FMLA request to her employer until June 8, 2009, nearly a week after she was informed of her termination.  Thus, Plaintiff sought leave under the FMLA a week after her employer decided to terminate her employment.  Once discharged, Plaintiff was not entitled to FMLA leave.  *See Brohm v. JH Properties, Inc.*, 149 F.3d 517, 523 (6th Cir. 1998).  Therefore, she did not exercise a "protected right" when she submitted her FMLA request.  Furthermore, it was impossible for Arbors management to have discharged Plaintiff on the basis of her FMLA request because the request was made after Arbors management finalized its decision to terminate her employment.

Accordingly, Defendants are entitled to summary judgment on Plaintiff's claim of wrongful termination under the FMLA.

## IV.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 12).

The Clerk shall remove Document 12 from the Court's pending motions list.

The Clerk shall remove this case from the Court's pending cases list.

**IT IS SO ORDERED.**

> */s/ George C. Smith*
> **GEORGE C. SMITH, JUDGE**
> **UNITED STATES DISTRICT COURT**

-18-